WALKER *vs.* HILL'S EXECUTORS and others.

1. The oath annexed to an answer to a bill which prays for answer without oath, though evidence against the complainant on a motion to dissolve the injunction, is not evidence on the hearing of the cause.

2. An agent attending a sale for his principal, has no right to buy the property at that sale for himself, or any one else than his principal, at a price less than would secure his principal's claim. He would be held a trustee for his principal, and any written or properly declared trust for any other, would be held subject to the first trust for the principal.

3. The testimony of a complainant, taken after the defendant's executors were made parties, but before either of them had been sworn as witnesses, is incompetent : and if such party is objected to as incompetent when offered, his testimony is inadmissible.

4. If a plaintiff in execution, make an agreement with the defendant that he will buy the property at sheriff's sale and hold it for his benefit, and takes advantage of such agreement to buy in the property at prices lower than he otherwise could have done, he will be taken to hold in trust for the defendant, who will be allowed to redeem. But a court of equity will not enforce such an agreement, being merely in parol, unless the fraud or *mala fides* be clearly and fully shown.

5. The mere non-performance of a beneficial parol agreement, is not a fraud which will induce a court of equity to compel performance.

6. It is the settled doctrine, that if the answer admits a contract without stating that it was not in writing and setting up the statute of frauds, the statute cannot be used as a defence. The admission will be held to be of a written contract, and no proof need be offered of it. But if the pleading or answer denies the existence of any agreement, the plaintiff must prove a written agreement.

7. Under the prayer for general relief, only such relief can be given as is warranted by facts positively and clearly set forth in the bill.

This cause was argued upon final hearing, on the pleadings and proofs.

*Mr. Vanatta* and *Mr. Williamson*, for complainants.

*Mr. C. Parker*, for Hill's Executors.

*Mr. T. Little*, for McAlpine.

THE CHANCELLOR.

The complainant alleges that certain real and personal property, in the county of Morris, was held by the defendant, Hill, in trust for him. That the defendant, Van Buren, by a power of attorney procured from Hill, when Hill was of unsound mind and incapacitated for the transaction of business, sold the real and personal estate, except the library, to the defendant, McAlpine, who had notice of the trust, for a grossly inadequate price. The complainant asks that Hill be declared to have held the property in trust for him, with a lien thereon for the amount due on two judgments recovered by him against Walker, and that McAlpine may be declared to hold the part conveyed to him subject to the same trust, and that the complainant be allowed to redeem; and that the property, if necessary, be sold, and after payment of the liens thereon, the residue of the proceeds of sale may be paid to the complainant; and that the sale to McAlpine may be declared illegal and fraudulent, and set aside. It contains, also, the general prayer for relief.

The trust is stated in the bill to have arisen from these facts: The complainant, in April, 1857, confessed a judgment to Hill for $2026, and in November following, another for $1621. His real property was subject to three mortgages prior to the first judgment, amounting to $21,300, besides interest, and to another mortgage to A. W. Cutler, for $3000, given in October, 1857. In 1862 Walker became embarrassed; he had be-

come security for New York merchants, who had failed in 1857, and left him liable for large sums, without consideration to him. That Hill was wealthy, and willing to allow time, and no sale had been made until May 2d, 1862, when all the personal property was sold under Hill's judgments and executions thereon, by the sheriff, and the whole, with the exception of a few articles amounting to $123, was purchased by Hill. The personal property sold was worth $17,000, but the sale amounted to only $3089.23. The understanding between Hill and the complainant, when he purchased the personal property, was that he would hold the same as security for the complainant's indebtedness to him. That when complainant should pay that indebtedness, then the same should go to the use and benefit of the complainant and his other creditors, and that such was the intention of Hill. It was generally understood that Hill was bidding on the personal property for the use of the complainant, and because he was doing so the complainant permitted it to be sold at such low prices.

On the 26th of August, 1862, by virtue of these executions of Hill, and other executions, the sheriff sold the farm of 282 acres to Hill for $20; and within a few months after this, four other tracts, containing about 42 acres, were sold by the sheriff, under these executions, to Hill for the sum of $34.

One Atwater, who held a mortgage on the property, in a foreclosure suit obtained a decree to sell the real estate for the amounts due on his mortgage and two mortgages held by defendants in the suit. The amount due on these three mortgages, for debt and costs, was $32,671.71, with interest from March 9th, 1864. On the 12th of September, 1864, when this sum with the interest and sheriff's fees amounted to nearly $34,000, the sheriff sold the real estate to Hill for $19,999, and conveyed it by deed executed shortly after the sale, but not delivered until two years afterwards.

All these purchases the bill alleges were made under the same understanding as that on the sale of the personal pro-

perty, that is to say, that Hill would hold the property merely as security for complainant's indebtedness to him.

The answer of the defendant, Hill, entirely denies all the allegations of the bill as to his purchase of this property, or any part of it, in trust for Walker, or that there was any agreement or understanding for that purpose. On the contrary, he avers that the purchase at the foreclosure sale was made by him as agent of, and for the benefit of his brother-in-law, George Walker, to whom, as holder of the third mortgage, one-half of the money directed to be made by the decree, was directed to be paid, and who, before the sale, had through Hill as his agent purchased the Atwater mortgage, and was thus entitled to about three-fourths of the decree; that he intended to have made the purchase in the name of G. Walker, and applied to the sheriff to allow him to add the words "agent for George Walker" to his name, so that the deed might be made to George Walker; that the property, when sold to McAlpine, was sold at the request, and for the benefit of George Walker, for whom he had purchased it, and all the proceeds paid to him except $2500 the value of the personal property, and the amount due to Maria Walker on the second mortgage.

This answer is sworn to, although the bill prays for answer without oath. The oath is legal, as it was proper and necessary to render the answer of use on a motion to dissolve the injunction, but it is of no value, and cannot be used as evidence on the hearing of the case.

In considering the question whether the allegations on which the trust is founded are sufficiently proved, I shall first assume that the complainant is a competent witness, and consider the value of his testimony. Hill died after filing his answer. After his executors were made parties, and before either of them had been sworn as witnesses, the complainant was sworn, being at the time objected to as incompetent by the defendants.

The complainant is the only witness who testifies to any agreement or understanding between him and Hill, prior to

the sales, that Hill would buy in the property for his benefit, and this part of the case rests entirely on his testimony. The complainant labors under peculiar disadvantages; he is admitted by a statute derogatory of the common law, and of well established rules of evidence, and which expressly declares that his interest may be shown to affect his credit. By asking for answers without oath, he excludes the oath of the defendant Hill, admitted to be a man of character and respectability, who had been a generous friend, the only person who seems to have had any knowledge of the transaction, besides himself. Hill now being dead, the testimony of the complainant is against the policy of the statutes legalizing such evidence, which only intended to admit the evidence of one party, where the other could be produced to contradict or confirm him, it being intended to avoid the opportunity and temptation to perjury, weighing on a party who is testifying to a private bargain between himself and his dead adversary. The fact that this adversary in his sworn answer has denied the whole charge, cannot be used to discredit him any more than to contradict his testimony, but it calls upon the court to give grave attention to his evidence.

I have no doubt from the whole case that Mr. Hill intended to bid in the property at all the sales, and to dispose of it to pay the creditors of Walker, including himself, his brother-in-law, George Walker, and the encumbrances which were prior to his own judgments, and George Walker's mortgage, and that he did not intend or expect to make any profit for himself by purchasing it; and I have little doubt but that before these sales he said that he intended to bid in the property. But this is not the question here; it is whether he made any agreement with the complainant that he would bid it in, and hold it in trust for him and his creditors, after the amount of his bid, or of his own claim against the complainant, was repaid. Any declaration after the sale, by Hill, that he bought in trust for Walker or his creditors, or that he held it in trust for him and his creditors, would

clearly be insufficient under the statute of frauds, or by any construction ever yet given to it, to create or to prove a trust; it must arise from an agreement entered into before the sale, and acted upon at the sale.

Walker testifies that in the spring of 1862, he and Mr. Hill had a talk over the matter, and they agreed that they would have the property sold under the executions, "and that he would bid on it, or cause it to be bid in at the lowest possible sum, at whatever sum, more or less, he agreed to bid it in, without reference to his executions, and to hold it in trust for me till I got ready to pay him the sum bid by him, whether it was more or less." And again: " In this previous agreement that I had with Hill, in the spring of 1862, he agreed to bid off the personal estate and the real estate, and hold it for me subject to the encumbrances, using his judgments and all others for that purpose."

Walker urged the sale under the Atwater foreclosure, which took place August 25th, 1864, when he was out of the state; and he wanted Hill to buy it for the amount due on the first two mortgages, leaving George Walker's mortgage out. He testifies, "previous to this, before I went away, Mr. Hill said, if the property had to be sold, he would bid it in, and hold it the same as at the other sale." Again: When asked, what he was to pay Hill on surrendering the trust, he says: " The two judgments of April, 1857, and of November, 1857, amounting to $3650, and the interest."

This is all the evidence of Walker on the subject; it is very meagre and unsatisfactory for so important a matter as this. He gives neither time, place, or circumstance, to these agreements. He does not give, or attempt to give, the language in which they were made.

This testimony does not agree with the allegations in the bill, nor does the story first told by him in his testimony, that Hill should buy it in and hold it until Walker paid the amount of his bid, agree with the last story, that he should pay the amount of his two judgments. These variations are not merely verbal, they are substantial. These state-

ments are utterly inconsistent with his testimony in the Atwater case, in September, 1862, after the sale in August, 1862, in which he states that he had no interest in the question, whether the Atwater mortgage was void for usury. He testified to a falsehood then or now.

The letter of Hill to Walker, in which he asks whether he shall sell the low meadows for $400, and the Shelley meadows for $150, do not support Walker's claim. It does not appear that either of these meadows were part of the tracts bought by Hill. It would seem from the papers in evidence, rather that they were part of the sixty acres owned by Walker outside of the farm, and the four tracts conveyed to Hill and included in the Cutler mortgage, which was afterwards assigned to Hill.

Cutler was, throughout, the agent and attorney of Walker, who was his brother-in-law. Hill's wife, who had been dead for years, was the sister of Walker and of Cutler's wife, and Cutler was the attorney or agent of Hill. Cutler was the person who bid off all the personal property for Hill, and who bid off the farm at both the sheriff's sales, and who as agent for Walker urged on the first sale, and who was written to by Walker to insist upon the foreclosure sale. Yet Cutler seems to have no knowledge of any such agreement as insisted on by Walker. It seems hardly possible that there should have been such an agreement, without his having knowledge of it from one or both, or that he should not have been present when the agreement was made. His letter to Hill in 1866, when in Bermuda, denying that he ever heard Hill say that he had bought in trust for Walker, is inconsistent with his having heard any such agreement; else it would be rank hypocrisy in both him and Hill.

The only part of Cutler's testimony that refers to any understanding or agreement between Walker and Hill regarding this purchase, is where he is speaking of the foreclosure sale. He is asked whether he understood, or supposed, that Hill purchased for his own use; he answers

"that the understanding was, that Hill was to take the title for the benefit of the mortgagees." To the question whether that understanding was arrived at in Walker's presence, or talked of in his presence prior to the sale, his answer is a simple "yes;" which would be true if Hill had spoken of it to the mortgagees, or a stranger in Walker's presence. When asked whether Walker assented or dissented, he avoided answering. These answers of Cutler show, both that he knew of no agreement between Walker and Hill, and that he did know what Hill's object was in making the purchase, and that it was known to Walker; it was simply to protect the mortgagees. Cutler was the attorney, agent and friend of Walker; he was opposed to the sale made through Van Buren to McAlpine; it was made by summarily displacing Cutler from the agency given to him. Cutler was in the neighborhood, knew the property, and was so related to Hill and George Walker that he was entitled to their confidence. The sale was entrusted to Van Buren, who knew nothing of the property, or its value, and who hastily made an improvident sale for a price several thousands of dollars less than Cutler could have obtained. Cutler, naturally, I would almost say properly, was opposed to this sale, and the case shows that he did everything which he could do with propriety, to put a stop to it. Had he known of any understanding, or agreement of Hill with Walker, such as is claimed by the latter, he would have been willing, when thus plainly asked, to have disclosed it, fully and truthfully. More than this, if he had known of any such agreement or trust in any way, so that he believed it, he could not, with common honesty, have been silent on the day when the contract was made and signed, almost in his presence, and much to his dissatisfaction. He would not have said, as several witnesses testify, that the title was as good as any in the county; he would naturally have told the truth, and said "the title is held by Hill in trust for F. W. Walker, without whose consent Hill cannot sell, and I know Walker will not consent at that price;" both had com-

missioned him to sell, but at a much higher price. Such an explanation would have effected what Cutler had at heart; it would have stopped this sale. But Cutler was truthful, and would not invent such a fiction.

From Cutler's evidence and his conduct, I am convinced that he knew of no such agreement or understanding with Hill, as that claimed by the complainant; and from his relation to these parties and to the whole transaction between them, I am convinced that such an agreement could not have existed without his knowing it.

In my view, the evidence of Walker is not supported by Vanderbelt and Mrs. Gleason. The admissions by Hill, that he held that property in trust for Walker, or that he bid it in to keep it for him until he should be out of trouble, to prevent it being sacrificed, might, if believed, be well held to refer to what his own object or intention was in buying it in; it shows no agreement with Walker, binding him to buy it, or to hold it for him. But the testimony of both these witnesses strikes me unfavorably. Vanderbelt's story of the confidential disclosure, as well as his accidental meeting with Walker, three weeks before his testimony was needed, is highly improbable, without regard to his mistake as to dates. The allegations as to Mrs. Gleason's character and her relations with Hill are not proved, and can have no weight against her credibility; but the whole manner of her testimony, as well as her statements with regard to Hill's incapacity, destroy her credibility. They strike me as two *procurable* witnesses, of the kind which the statute of frauds was intended to suppress.

There was no call at either sale for such a bargain as that contended for; nor is there proof of any sacrifice at either sale so far as regards Walker. The mortgages on the farm, at the sale in 1862, amounted to about $28,000; and although the proof shows that in 1866 or 1869 the farm was worth $40,000, it was the opinion of witnesses who did not know of the sale of any like farm in that vicinity, at that price, and none of whom testify as to its value in 1862.

At that time all values were depressed by the war, commenced one year before, and when the large increase in prices of real estate in all localities had not yet taken place. At that time $28,000 was, no doubt, a much larger price for his farm, than $40,000 in the high prices of 1866 and 1869. There is no proof, and I do not believe, that this farm was then worth $30, subject to the encumbrances.

There may have been some sacrifices as to the personal property. But the live stock was much depreciated, in bad condition, nearly starved to death. The furniture was old and old-fashioned, and such as does not bring high prices on sale by auction or otherwise. The sale was well attended; few others besides Hill bought, because he bid at higher prices than others were disposed to give, and they knew or supposed that the amount of his debt made it his interest to buy at any price; there is no proof of any impression that he was buying for Walker. The books may have sold below their value; but books in a library of this kind, never bring, and are seldom worth their estimated value.

At the time of the foreclosure sale, George Walker owned the decree and the first mortgage, and also the third mortgage, on which there was then due over $25,000. Hill was his attorney and agent in these very matters, and attended the sale as such. There was due to Maria Walker, on the second mortgage, about $8000; in all about $34,000. This was, as I judge, about the value of the property at that time, if it was worth $40,000 three years later. There is no proof of its value in 1864. Hill, if acting as the agent of George, had no right to buy the property at that sale for himself, or any one else than George, at a price less than such as would secure the claim of George. Like a solicitor attending for his client, he would be held a trustee for his principal, and any written or properly declared trust for any other would be held subject to this first trust for his principal. I am satisfied from the proof that Hill intended to purchase, and actually did purchase for George Walker at the foreclosure sale, and not for the complainant.

Again : if I am mistaken in my view of the evidence of Walker, I am of opinion that he was not a competent witness ; and as there is no testimony but his as to any agreement before the sales upon which his purchases were made, his case must fail without his testimony.

At common law he was clearly incompetent; and the statute of 1859, which permits a party to be sworn, expressly provides that a party shall not be sworn when the opposite party is sued in a representative capacity; a very wise and proper provision, as this very case exemplifies. When Walker was sworn Hill was dead, and his executors were defendants. Incompetency at the time when he was sworn, is the test of the admissibilty of his testimony, as was held in this court, and the Court of Appeals, in the case of *Marlatt* v. *Warwick and Smith,* 3 *C. E. Green* 108 ; 4 *Ibid.* 439. And he cannot be admitted under the provisions of the act of 1855, to disprove the responsive allegations in the answer, because here these allegations are no evidence, and therefore need not be disproved; or his testimony at most could be admitted to do away with the effect of such responsive allegations as proof, leaving the burden of proving his case upon the complainant.

It has been held, and must be taken as the established doctrine of this court, that if a plaintiff in execution make an agreement with the defendant, that he will buy the property at sheriff's sale and hold it for his benefit, and takes advantage of such agreement to buy in the property at prices lower than he otherwise could have done, he will be taken to hold in trust for the defendant, who will be allowed to redeem. *Combs* v. *Little,* 3 *Green's Ch.* 310 ; . *Marlatt* v. *Warwick,* 3 *C. E. Green* 108 ; *S. C.,* on Appeal, 4 *C. E. Green* 443 ; *Merritt* v. *Brown, Ibid.* 286 ; *S. C.,* on Appeal, June Term, 1869.

In this last case the opinion of the Court of Appeals delivered by the Chief Justice, shows the danger of extending any farther the doctrine of raising trusts by parol agreements, in derogation of the wise and wholesome provisions

of the statute of frauds. It declares, in effect, that no mere parol agreement to purchase for the benefit of the defendant in execution will be carried into effect by a court of equity, unless it is accompanied by circumstances of fraud, or has been made use of by the purchaser to obtain the property for an inadequate consideration, or to oppress the defendant; and in such cases to overcome the protection of the statute, the fraud or *mala fides* should be proved by the clearest and most complete evidence. This is a most salutary and proper limitation of the doctrine, not inconsistent with the former decisions, and necessary to save the provisions of the statute of frauds as to parol trusts, and to make bidders at sheriff's sales secure. Without this limitation any defendant who, after the death of a purchaser, would testify that he promised before the sale to buy for him, or who could get one witness to testify with him to the fact, in the life of a purchaser, could convert the purchaser into a trustee, and take from him the property when it had increased in value.

In this case, if we admit Walker as a competent witness, and believe all that he has testified to, there is no proof of fraud in Hill, or that he has made use of the agreement to procure the property at inadequate prices, or to the oppression of Walker, or that he has done anything that at all savors of fraud or oppression. The mere non-performance of a beneficial parol agreement is not a fraud which will induce a court of equity to compel performance, or else every mere parol contract for the sale of a farm or a chattel worth thirty dollars, would be enforced in equity on the ground of fraud. Walker's case, as shown by his evidence, is the case of a naked parol contract, now become beneficial for him to have performed; this the Court of Appeals has declared he is not entitled to have enforced by a court of equity.

Hill has not pleaded, or set up the statute of frauds in his answer as a defence. But this is not necessary when the answer denies the existence of any contract or agreement, as the answer of Hill does most fully. The settled doctrine of the courts is, that if the answer admits a contract, with-

out stating that it was not in writing and setting up the statute of frauds, the statute cannot be used as a defence. The admission will be held to be of a legal contract, that is, a written one, and no proof need be offered of it. But if the pleading or answer denies the existence of *any* agreement, the plaintiff will be obliged to prove one; and he must prove a legal agreement, which, in cases within the statute of frauds, is a written one. *Browne on Stat. of Frauds*, § 511; *Buttemere* v. *Hayes*, 5 *M. & W.* 456; *Johnson* v. *Dodgson*, 2 *Ibid.* 653; *Leaf* v. *Tuton*, [10 *Ibid.* 93; *Eastwood* v. *Kenyon*, 11 *Ad. & Ell.* 438; *Cozine* v. *Graham*, 2 *Paige*, 181; *Ontario Bank* v. *Root*, 3 *Ibid*, 478; *Vaupell* v. *Woodward*, 2 *Sandf. Ch.* 143.

And, on the other hand, if the agreement to buy and hold in trust for Walker had been clearly proved, I am satisfied, from the allegations in the bill and the evidence of Walker and of Cutler, his attorney, that the object of Walker in having his property sold, and procuring Hill to purchase it, was to hinder and delay his creditors, and have it secured for himself against their claims. Walker states his embarrassments by debts contracted as surety, in his bill, preparatory to stating the confession of judgments to Hill, and his arrangements with him about the purchases; and in his evidence, he says that the object of the sale of 1862 was to place his property in safe hands, so that he might go away and do his government business like a true patriot, and that his property might not be sacrificed by any thing that might occur in his absence.

Mr. Cutler says, as to the sale of 1862, " my impression is, that there were these subsequent judgments, and it became necessary to have the title of this personal property out of Mr. Walker." "It was the intention of that sale to vest the title in Mr. Hill, so that it could not be reached by other executions." If this was the object of making the sale, which was not necessary for the security of Hill, before effected by his levies, and the sale of property far exceeding in value the amount of his claims, was made to

effect that object, with the understanding that Hill should hold for Walker, it is a clear case of fraud against creditors, and Walker can have no relief in this court.

On the argument it was contended that the delivery of the sheriff's deed on the foreclosure sale, after the sheriff was out of office, and at a place out of the state, and after the lapse of so long a time after the sale that the sale should be presumed to be abandoned, made the delivery illegal and void; and that the sale of the personal property without a bill of sale, and without actual payment or delivery, rendered the sale of the personal property void.

These issues are not raised by the bill; that states the sale of the personal property, and the sale and conveyance of the real property by the sheriff, as actual existing sales and conveyances, and asks relief against them, by declaring the property so conveyed to be held in trust. If these were proper grounds for relief in equity, there are no facts stated in the bill on which such relief could be founded. There is no specific prayer for such relief; the only prayer besides the prayer for injunction and general relief is, that Hill and McAlpine may be declared to hold the property in trust for the complainant. Relief can be given under the general prayer, only when such relief is warranted by facts positively and clearly set forth in the bill. No facts stated in the bill, if the bill was expressly admitted to be true in all things, would warrant this relief. This is conclusive against these matters.

The view I have taken of the case will make it unnecessary for me to consider whether McAlpine, who was a *bona fide* purchaser for value, had sufficient notice of Walker's claim to put him on inquiry as to it, or can in any way be affected by the trust for him.

The bill must be dismissed with costs as to all the defendants.